**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN SUPERCONDUCTOR CORPORATION and NORTHEAST POWER SYSTEMS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>VARSTEC POWER SOLUTIONS, INC., PAUL STECIUK, PETER STECIUK, and GLENN LACKEY II,<br><br>Defendants. | Case No. 1:26-CV-1788 (ECC/PJE)<br><br>**VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF** |

Plaintiffs American Superconductor Corporation ("AMSC") and its wholly owned subsidiary, Northeast Power Systems, Inc. ("NEPSI") (collectively, "Plaintiffs"), for their Verified Complaint for Injunctive and Other Relief against Defendants VarStec Power Solutions, Inc. ("VarStec"), Paul Steciuk ("Paul"), Peter Steciuk ("Peter"), and Glenn Lackey II ("Lackey") (collectively, "Defendants"), state as follows:

1. This is an action for injunctive relief and damages arising out of Defendants' actual and threatened trade secret misappropriation, Paul, Peter, and Lackey's breaches of contract, and VarStec, Paul, and Peter's tortious interference with contract.

2. VarStec is a new competitor to NEPSI in fully integrated medium-voltage reactive compensation systems for power factor correction, harmonic mitigation, dynamic voltage support, motor starting and surge protection industries. The products include custom medium-voltage, metal-enclosed power capacitor banks, harmonic filter banks, hybrid statcoms, and surge protectors.

3. Rather than fairly compete, however, VarStec and its principals, Paul and Peter, have decided that the only way to compete is to misappropriate NEPSI's trade secrets and

proprietary information, interfere in NEPSI's contracts, and breach their confidentiality and development assignment provisions of their agreements with NEPSI, all to their own benefit and Plaintiffs' immediate and irreparable detriment.

4. To that end, Plaintiffs recently learned that, between August 12, 2026 and August 14, 2026, on information and belief at VarStec's, Paul's, and Peter's behest, then-NEPSI employee, Lackey surreptitiously downloaded over 7,000 documents from NEPSI's server, including thousands of confidential, proprietary, or trade secret documents.

5. Based on the evidence that Plaintiffs have discovered to date, it appears that Lackey misappropriated this information while in New York, purportedly on a business trip to NEPSI, but possibly at or around a time during which he was having dinner with Paul or Peter, despite then being employed by NEPSI.

6. Further illustrating the inappropriate and illegal manner in which he acquired the files, for many of the files, Plaintiffs have determined that Lackey changed NEPSI file names to identify the files as belonging to VarStec.

7. Lackey provided 2-weeks' notice that he was resigning from NEPSI on August 21, 2026, and his last date of employment with NEPSI was on September 4, 2026.

8. Less than a week later, VarStec publicly launched its website on September 8, 2026.

9. VarStec's website shows that it intends to run a business that is a carbon copy to NEPSI's business, a business that Paul and Peter co-founded in 1995. Paul and Peter's brother Frank Steciuk ("Frank") joined NEPSI in 1999.

10. Peter, Paul, and Frank sold NEPSI to AMSC in 2020, along with all of its intellectual property, proprietary information, and trade secrets. That Peter and Paul have opened a directly competitive business in a space where only a handful of companies compete is not, by

itself, improper. But misappropriating and using Plaintiffs' proprietary information and trade secrets is. Using Plaintiffs' proprietary information and trade secrets to offer the same products and services in a bespoke industry also is. And causing a NEPSI employee to steal Plaintiffs' computer files and trade secrets before he resigned from NEPSI also is trade secret misappropriation.

11. Plaintiffs' proprietary information and trade secrets enables it to design custom solutions for its customers in the medium-voltage reactive compensation systems for power factor correction, harmonic mitigation, dynamic voltage support, motor starting and surge protection industries. In addition, the extensive array of its computer files and trade secrets, which were developed over many years of experience in the industry, further enable Plaintiff to create its customized designs in a matter of days, rather than typically six or more weeks as is required by Plaintiffs' competitors. Plaintiffs' ability to quickly prepare and propose designs for customers is part of its reputation and goodwill that distinguishes it from its competitors. By misappropriating Plaintiffs' computer files Defendants are able to replicate both Plaintiffs' designs and its responsiveness, and threaten to do so by positioning itself as a direct competitor.

12. All of this conduct necessitates that the court immediately and temporarily and preliminarily enjoin Defendants' actions, order Defendants to immediately cease their use, possession, and disclosure of Plaintiffs' trade secrets, and order Defendants to immediately return Plaintiffs' trade secrets to Plaintiffs. Plaintiffs also seek damages that they have suffered because of Defendants' actions.

13. AMSC is a leader in the power control systems industry, designing, developing, and deploying power control systems that harmonize an increasingly complex energy system. AMSC was founded in 1987 and for decades has provided technologies for reliable, effective and

Docusign Envelope ID: E8E14C35-9664-89B9-80D2-7B5336891E76


efficient power delivery, including power and protection systems involving voltage compensators, capacitors, transformers, and rectifiers.

14. NEPSI is a trusted name in power factor correction and harmonic filtering, manufacturing bespoke medium-voltage, metal-enclosed capacitor bank and harmonic filtering systems that are utilized in power stations throughout the country and world. Because of the nature of the products that NEPSI delivers to its customers, it requires high reliability, integrated protection, control, and communication systems necessary in challenging environments and remote locations.

15. For nearly 30 years, Peter and Paul, along with Frank, were integral to the development and success of NEPSI, serving as the founders of NEPSI.

16. Over the years, NEPSI has become one of—if not the—foremost custom designers of metal-enclosed power capacitor banks and harmonic filter banks. To reach this stage required decades of testing and refinement of the design and design process. It also required years and extensive investment to develop suitable products with its source vendors, including following AMSC's acquisition of NEPSI.

17. Indeed, these products are not some off-the-shelf products, but instead, are customized for specific customer requirements from method and components components optimized over decades of testing and refinement of the design and designing process. Each of these products and components are utilized for applications requiring large power requirements and are essential to NEPSI's business model.

18. NEPSI's designs, component specifications, manufacturing processes and specifications, which were developed and based on decades of work on different projects with different requirements, include internal computer aided design ("CAD") files, material

specifications, approved supplier data, computer numerical control ("CNC") files, assembly instructions, technical specifications, testing information, supplier information, and the like.

19. NEPSI's designs, component specifications, manufacturing processes, and specifications, are proprietary information and/or trade secrets, and provide NEPSI with a competitive advantage over its competitors.

20. NEPSI's reputation in the industry is as a provider of solutions that are both customized and faster than competitors. NEPSI's rapid design capabilities and reputation further provide NEPSI with a competitive advantage over consumers.

21. NEPSI's designs, design processes, component specifications, manufacturing processes, and specifications are not publicly-available information, and NEPSI takes significant efforts to protect this information, including tracking access to its files, and having employees with access subject to confidentiality agreements.

22. In 2020, AMSC acquired NEPSI through a Stock Purchase Agreement (the "SPA"), through which AMSC obtained all rights in NEPSI, including all of NEPSI's know-how, proprietary information and trade secrets, and NEPSI became a wholly-owned subsidiary.

23. Through the acquisition, Peter, Paul, and Lackey made certain agreements to Plaintiffs, containing certain post-employment restrictive covenants and continuing confidentiality obligations.

24. In exchange, AMSC paid Paul and Peter millions of dollars in exchange for these agreements, the sale of NEPSI and all of its stock and other assets to AMSC, and for their agreement to not use, disclose, or otherwise interfere.

25. Rather than abide by those agreements and their statutory and common law obligations, Defendants have actually misappropriated and threaten to continue to misappropriate

Plaintiffs' trade secrets. On information and belief, they incentivized and directed Lackey to download and misappropriate thousands of confidential and trade secret NEPSI computer files, including CAD drawings, CNC files, programs, and source code, technical specification, and supplier information. They have used and threaten to use NEPSI's trade secret design process, design specifications, component part designs, and component part specifications to offer for sale and/or selling identical products as NEPSI. They have shown an intent to go after NEPSI's customers and vendors offering the same customized solutions and rapid response as NEPSI, threatening Plaintiffs' trade secrets in the process, such as NEPSI's customer lists, customer preferences, and component part specifications that NEPSI developed at great expense and over many years with its vendors. Indeed, another former NEPSI employee, Alex Steciuk, who is the son of Paul and served as NEPSI's Director of Sales, an important role as NEPSI's key interface with customers, voluntarily resigned rfrom NEPSI on September 15, 2026 and announced the very next day on Linkedin on September 16, 2026 that he had joined VarStec as Senior Director, Sales and Business Development. On September 16, 2026, Varstec confirmed on its web site that Alex Steciuk had joined the company.

26. Given Paul, Peter, and Lackey's positions with VarStec, VarStec's efforts to unfairly compete, and the evidence that Plaintiffs have uncovered to date, Plaintiffs have suffered and will continue to suffer irreparable harm based on Defendants' actions, including harm to Plaintiffs' reputation for customized solutions and rapid response.

27. Before Plaintiffs' confidential and trade secret information, customer relationships, vendor relationships, and employee relationships are further eroded, Plaintiffs seek temporary, preliminary, and permanent injunctive relief to protect the intrinsic value of its confidential information, customer, vendor, and employee relationships, and goodwill.

28. Plaintiffs seek to enjoin Defendants from: (a) misappropriating, possessing, or using, directly or indirectly, Plaintiffs' trade secret information; (b) breaching the Employment Agreements (Paul and Peter) and Employee Nondisclosure and Development Agreement (Lackey) or tortiously interfering in those agreements (VarStec); and (c) possessing Plaintiffs' confidential and proprietary information.

29. Plaintiffs also seek all of the damages they have suffered as a result of Defendants' actions.

## PARTIES

30. American Superconductor Corporation is a Delaware corporation with its principal place of business in Ayer, Massachusetts.

31. Northeast Power Systems, Inc. is a New York corporation with its principal place of business in Queensbury, New York.

32. VarStec Power Solutions, Inc. is a Delaware corporation with its principal place of business in Saratoga Springs, New York.

33. Paul Steciuk is one of the original founders of NEPSI, and continued working for NEPSI after AMSC and NEPSI completed the SPA in 2020 until he voluntarily resigned on or about April 28, 2023. He holds himself out to be the co-founder, President, and Senior Power Systems Engineer for VarStec. On information and belief, Paul is domiciled in and a citizen of Saratoga Springs, New York.

34. Peter Steciuk is also one of the original founders of NEPSI, and continued working for NEPSI after AMSC and NEPSI completed the SPA in 2020 until he voluntarily resigned on or about September 30, 2024. On information and belief, Peter is domiciled in and a citizen of Lake George, New York.

35. Glenn Lackey II worked for NEPSI starting in October 2010. While Lackey worked remotely, he occasionally visited the New York facility until September 4, 2026, when he voluntarily resigned and, on information and belief, became employed with VarStec. On information and belief, Lackey is domiciled in and a citizen of Liberty Hill, Texas.

## JURISDICTION AND VENUE

36. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because Plaintiffs' Defend Trade Secrets Act ("DTSA") claim, brought under 18 U.S.C. § 1836, *et seq.*, raises a federal question. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a).

37. This Court has personal jurisdiction over Paul, Peter, and VarStec as they are each residents of and domiciled or incorporated and headquartered in New York.

38. This Court has personal jurisdiction over Lackey through the New York Long-Arm Statute, NY CPLR § 302, as he has committed tortious acts within the state, namely committing trade secret misappropriation of trade secrets owned by a New York corporation, headquartered in New York, whereby the servers were likewise located in the state, and where Lackey was present in the State at the time that he misappropriated NEPSI's trade secrets. NY CPLR §302(a)(2). Further, even assuming Lackey's actions occurred entirely outside of the state of New York, Lackey is still subject to the personal jurisdiction of this Court insomuch as he committed a tortious act causing injury to the property of a New York citizen, NEPSI, and he regularly engaged in business with the state of New York, insomuch as he held employment with a New York citizen, NEPSI, for approximately 16 years, and has taken employment with another New York citizen, VarStec, thereby triggering personal jurisdiction under NY CPLR §302(a)(3)(i).

39. Venue is proper in this District under 28 U.S.C. §1391(b)(1) as to Paul, Peter, and VarStec as these defendants reside in this judicial district, and 28 U.S.C. §1391(b)(2) as to all

Defendants because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. To wit, the Defendants committed and continue to commit tortious acts in and/or related to this State and this District, and all Defendants performed acts that constitute doing business within the state of New York. Additionally, NEPSI's principal place of business is in Queensbury, New York, and Plaintiffs regularly conduct business in New York.

## EVENTS GIVING RISE TO THIS ACTION

### PLAINTIFFS' BUSINESS

40. AMSC was founded in 1987 to commercialize high temperature superconductor (HTS) wire for, among other things, electric power grid applications and industrial motors and generators. In 1997, AMSC made a major strategic move by acquiring Superconductivity, Inc. (SI), a pioneer and manufacturer of low-temperature Superconducting Magnetic Energy Storage (SMES) systems.

41. This acquisition was a crucial pivot point that transformed AMSC from purely an HTS wire research firm into a commercial provider of complete, electric grid-ready power quality systems. These grid power quality systems included very sophisticated "active" dynamic software and semiconductor switch-based systems known as STATCOMs, sold under its D-VAR brand.

42. With the acquisition of NEPSI, its customized, "passive" grid management products complemented AMSC's "active" D-VAR STATCOM systems. NEPSI is the most trusted name in customized power factor correction and harmonic filtering, manufacturing medium-voltage, metal-enclosed capacitor bank and harmonic filtering systems that are utilized in power stations throughout the country and the world.

43. AMSC has made other acquisitions related to the electric grid to enable it to become an industry leader in designing, developing, and deploying power solutions that harmonize an increasingly complex electrical system, helping its customers scale without added complexity or

size. AMSC's system-level products leverage the company's proprietary smart software and controls to provide enhanced resiliency and improved performance of megawatt-scale power flow.

44. Right now, AMSC is powering the evolution of a grid that is fit for the future: a more reliable and resilient grid built to support and incorporate a broad mix of energy sources. Its pioneering products, software and control solutions are creating more cost-effective and efficient ways to deliver power across a mix of energy sources to ensure a reliable grid that meets the rising demand of power and supports critical infrastructure.

45. Driving this demand includes a multitude of industries, including computer chip, battery and fuel cell manufacturers, as well as the mining, processing and assembly industries. Further, industrial manufacturers of these essential materials as well as semiconductor manufacturers must be able to power their factories in ways that maintaining power quality and reliability.

46. AMSC's power system solutions help to improve energy efficiency, alleviate power capacity and other constraints, improve system resiliency, and increase the adoption of renewable energy generation.

47. Demand for AMSC's solutions is driven by the growing needs for modernized grids that improve power reliability, security, and quality.

48. Concerns about these factors have led to increased spending by corporations and the military, as well as supportive government regulations and initiatives on local, state and national levels, including renewable portfolio standards, tax incentives, and international treaties.

49. As increased investments and production place greater demands on electrical infrastructure, AMSC's solutions help stabilize power quality and supply by mitigating harmonics

and improving overall system performance. Through these solutions, AMSC enables more efficient, reliable, and productive operations while supporting environmental requirements.

50. AMSC provides transformation, rectification, voltage management, and harmonic filtering solutions that help industrial and semiconductor facilities maintain stable, high-quality power for critical operations.

51. At the substation level, AMSC's solutions manage input power from the grid and control power for the operation of large-scale industrial equipment such as furnaces, chemical plants, or semiconductor fabrication plants. AMSC's capabilities to control and convert power help ensure continuous flow of stable high-quality power for its customers.

52. These systems protect and isolate critical manufacturing processes from power system events, including voltage sag, that could otherwise trip these sensitive processes operations and result in severe disruptions and loss of a customer's manufactured products.

53. These systems closely monitor incoming electric supply and react in sub-cycle time frames to mitigate voltage sags and swells to provide a conditioned power to the processes.

54. These sag mitigation systems can include both dynamic and static voltage management as well as AMSC's harmonic filter solutions which are specifically designed to improve the facility's overall power factor and harmonic compliance needs.

55. AMSC's power system products address the renewal power generation and electrical grid and power infrastructure markets by providing solutions for the transmission grid, distribution grid, urban grid infrastructure, solar power, wind power, and marine protection systems.

56. With a plan to become an industry leader in designing, developing, and deploying power solutions that harmonize an increasingly complex electrical system, when an opportunity to

acquire NEPSI came available in 2020, with its specialized, custom "passive" grid management products, AMSC took it.

**AMSC's Acquisition of NEPSI**

57. On October 1, 2020, AMSC acquired NEPSI through a stock purchase, memorialized by the Stock Purchase Agreement (the "SPA"). A true and correct copy of the SPA is attached as Exhibit 1.

58. At the time, AMSC was a leading system provider of megawatt-scale power resiliency solutions that orchestrate the rhythm and harmony of power on the grid and further served to protect and expand the capability of the US's navy's fleet. By acquiring NEPSI, AMSC was able to directly align with its strategic priorities to accelerate profitable growth independent of its wind business, broaden its product offerings, and expand both market reach and market share.

59. At the time of its acquisition of NEPSI, NEPSI had a long history of profitability with a three-year average of approximately $25 million of revenue per year, and operating margins approaching 20 percent.

60. By leveraging NEPSI's leadership position in the static voltage management market for industrial applications, AMSC planned to expand its grid business offerings and deliver greater value to existing and new customers, business partners, and shareholders.

61. Moreover, the acquisition further aligned with AMSC's more recent push into the industrial market and further enabled AMSC to expand its offering of proprietary power electronics products in the industrial sector, based on NEPSI's own leadership position in the industrial market for power electronics. In other words, it was a match made in heaven: AMSC further solidified its position in the marketplace, and acquired valuable intellectual property, proprietary information, know-how, trade secrets, and an established leader in the market.

62. All of the shareholders of NEPSI were signatories to the SPA, with each of Frank, Paul, and Peter holding equal 33 1/3 interests in NEPSI. Moreover, Lackey was identified as one of the employees of NEPSI at the time of the transaction in the SPA.

63. Through the SPA, Paul and Peter were each paid millions of dollars in exchange for selling their stock and interest in NEPSI, including NEPSI's confidential, proprietary, and trade secret information, to AMSC.

64. As a material inducement for AMSC to enter into the SPA, Paul and Peter were required to execute the Employment Agreements and Lackey was required to execute the Employee Nondisclosure and Development Agreement. (SPA Recitals ¶¶ 4 & 5.)

65. Further, through the SPA, Paul and Peter transferred all of their rights to any intellectual property, proprietary information, know-how, and trade secrets owned by NEPSI to AMSC. (SPA §3.11(c).) Moreover, Paul and Peter also agreed that:

> No current or former shareholder, officer, director, or employee of the Acquired Companies and Company Subsidiaries (i) has any claim, right (whether or not currently exercisable), or ownership interest in any Company Intellectual Property or has excluded any Intellectual Property from their IP Agreement, or (ii) has been named as an inventor on any patent owned by, or pending patent application by, any Acquired Company or Company Subsidiary thereof for any device, process, design or invention of any kind now used by any of the Acquired Companies or Company Subsidiaries in the furtherance of their respective businesses, except for inventions that have been assigned to an Acquired Company or Company Subsidiary.

(SPA §3.11(g).)

66. Further, Paul and Peter each agreed to certain post-SPA restrictive covenants, including five-year noncompetition, employee non-solicitation, and customer non-solicitation restrictions. (SPA § 5.2(a), (b), and (c).)

67. Paul and Peter also agreed to a confidentiality provision, whereby they agreed that:

> Each of the Stockholders shall, and shall cause its Affiliates to, hold in confidence all knowledge, data, material and other information of a secret, confidential or

> proprietary nature with respect to the Company Group or the business conducted by the Company Group (including any Company Data or Confidential Data) and not to disclose, publish or make use of the same without the consent of the Buyer, except to the extent that such information shall have become public knowledge other than by breach of this Agreement by any Stockholder, or as shall be required by Law or upon the requirement of any competent authority (provided that the Stockholders shall provide the Buyer written notice of such requirement as promptly as practicable as permitted by Law).

(*Id.* §5.3(a).)

68. Moreover, to the extent that either Paul or Peter breached this confidentiality provision, they also agreed that "the remedy at Law for any breach … would be inadequate and that [AMSC] shall be entitled to injunctive relief in addition to any other remedy it may have upon breach of any provision of this Section 5.3." (*Id.* §5.3(b).)

69. Through the SPA, the parties agreed to New York choice-of-law and an exclusive New York venue provision. (*Id.* §§ 8.7 & 8.8.)

**PLAINTIFFS' TRADE SECRETS**

70. Following the acquisition of NEPSI pursuant to the SPA, AMSC became its parent company. As the buyer of all of NEPSI's stock, AMSC ultimately owns all of NEPSI's assets, including its confidential, proprietary, and trade secret information.

71. NEPSI designs, manufactures, assembles, and sells customized medium voltage, metal-enclosed shunt power capacitor banks and medium voltage metal-enclosed harmonic filter banks utilizing purchased and custom component designs created by NEPSI.

72. These products are not off-the-shelf products but are customized for specific customer requirements from methods and components optimized over decades of designing and refinement.

73. Each of these products and components are utilized for applications requiring large power requirements and are essential to NEPSI's business model.

74. NEPSI's capacitor banks are used for power factor correction and voltage support. In a power distribution system with inductive loads (like motors), reactive power is produced and causes the voltage and current to fall out of phase. Capacitor banks are placed in the system to offset the reactive power, improving power factor, and improving power quality.

75. A harmonic filter is an electrical system that reduces detrimental harmonic voltage distortion in an electrical network. In power systems with resonance issues and unwanted harmonics, i.e., extra frequency components appear in the system, NEPSI's harmonic filter banks can reduce these unwanted harmonics, thereby improving power quality and protecting electrical components.

76. NEPSI's power capacitor banks and harmonic filter banks are custom designed for application on industrial, commercial, and utility power systems that require medium voltage power factor correction, are designed for placement in outdoor or indoor substations, and come fully assembled, tested, and ready for interconnection. The power capacitor banks can be configured to include some or all protection, control, switching, disconnecting and grounding functions.

77. NEPSI's harmonic filter banks are custom designed for application on industrial, commercial, and utility power systems that require medium voltage power factor correction, var and voltage support, and mitigation from harmonic resonance or harmonic distortion. NEPSI's power capacitor banks and harmonic filter banks find wide application in many different industries including wind, mining, paper, chemical, and petroleum.

78. Because each customer for NEPSI's power capacitor banks and harmonic filter banks for power factor correction has individualized needs due in part to customer power system load characteristics, environmental factors such as temperature ranges, wind conditions, local air

particulates, climate, location, seismic conditions, and ground conditions, as well as operational requirements, each customer installation is comprised of a customized enclosure and selection of NEPSI components that it designed, developed, and refined over its decades in the industry.

79. Moreover, NEPSI's metal enclosures are extremely durable, resisting corrosion, dust, solar radiation, snow, and rain, thanks to marine-based paint over galvanneal steel and stainless-steel hardware, and are seismic, wind, and snow-load rated. NEPSI's metal enclosures also offer unmatched safety with an enclosure that protects against accidental contact with a key interlock system and custom door latching system.

80. NEPSI's designs, component specifications, manufacturing processes and specifications, which were developed and based on decades of work on different projects with different requirements, include internal computer aided design ("CAD") files, material specifications, approved supplier data, computer numerical control ("CNC") files, assembly instructions, technical specifications, testing information, supplier information, and the like.

81. NEPSI's designs, component specifications, manufacturing processes, and specifications, as well as technical specifications for its customers, are proprietary information and/or trade secrets and provide NEPSI with a competitive advantage over its competitors.

82. NEPSI's designs, component specifications, manufacturing processes and specifications, as well as technical specifications for its customers, are not publicly-available information, and NEPSI takes significant efforts to protect this information, including tracking access to its files, and having employees with access subject to confidentiality agreements.

83. By way of non-limiting examples, NEPSI's confidential, proprietary, and trade secret information include designs for its mounts, supports, heat exchange systems, enclosure system filters, enclosure safety locking mechanisms, insulators, gaskets, racking systems, system

configuration methodologies and processes, component coatings, and maintenance access systems. NEPSI's designs are embodied at least in its computer files, which include CAD files, CNC files, technical specifications, and testing information.

84. In addition, NEPSI maintains files regarding the technical specifications for its customers, and other customer information.

85. As discussed, NEPSI's confidential, proprietary, and trade secret information was designed and refined over years of improvements based on field experience.

86. NEPSI, through its decades of working with different suppliers of components, coatings, and component products also developed a reliable network of suppliers able to supply NEPSI's component, coating, and component product needs. NEPSI considers its supplier information to be confidential, proprietary, and trade secret information that provides it with products readily incorporated into NEPSI's customized solutions for its customers, enabling it to rapidly provide solution proposals weeks faster than its competitors, and provides it an economic advantage.

**PLAINTIFFS' PROTECTION OF THEIR CONFIDENTIAL INFORMATION AND TRADE SECRETS**

87. Because of the critical nature of Plaintiffs' trade secrets and how they allow Plaintiffs to succeed, Plaintiffs closely guard their trade secrets. Plaintiffs take specific measures to restrict access to and preserve the confidentiality of this information, including, but not limited to:

a. Requiring employees to sign agreements containing terms and covenants designed to maintain confidentiality and requiring the return of Plaintiffs' property upon resignation or termination;

b. Requiring employees to maintain the confidentiality of Plaintiffs' information;

c. Restricting access to computerized information through the use of passwords and a password-protected shared drive on its VPN network, and encrypting the data of the trade secrets on the servers;

d. Prohibiting the unauthorized physical removal of company information (via paper, disc, flash drive, or other media) and electronic transmission of such information (via email or other means);

e. Restricting access to computerized company information based on each individual employee's "need to know" in a confidential database;

f. Entering into non-disclosure covenants with its suppliers and clients to restrict what information regarding the relationship may be disclosed to third parties;

g. Prohibiting Plaintiffs employees from holding Plaintiffs trade secrets or confidential information on personal computers

h. Marking trade secret drawings internally and externally as "confidential";

i. Monitoring computer file access and activity; and

j. Removing employee access to confidential, proprietary, and trade secret information upon termination or release.

88. Plaintiffs rigorously maintain the confidentiality of their confidential, proprietary, and trade secret information because the information provides Plaintiffs a competitive advantage in the marketplace from which Plaintiffs derive economic value.

89. Any competitor of Plaintiffs'—including Defendants—who possesses or uses Plaintiffs' confidential, proprietary, or trade secret information would gain an immediate and unfair competitive advantage in the marketplace.

90. Possession and use of this information would enable competitors, among other improper advantages: (a) to develop trade secret and confidential and proprietary information without expending any time or resources, let alone the same degree of time and resources that Plaintiffs expended; (b) to quickly develop pricing strategies, designs, component part spec'ing, and services to unfairly compete with Plaintiffs in order to diminish or erode Plaintiffs' marketplace standing and customer relationships; (c) to discover initiatives that should not be pursued; (d) to benefit from customer relationships that first started with and was nurtured and developed by Plaintiffs; (e) to utilize Plaintiffs' know-how, developed at great expense over many

years, on how to design, manufacture, and utilize component parts developed in part by Plaintiffs in conjunction with third-party vendors; (f) to erode NEPSI's competitive advantage of being able to provide rapid responses to customers much faster than its competitors; and (g) to come to market with a product several years, perhaps even decades, before Defendants otherwise would, utilizing Plaintiffs' trade secrets in order to do so.

**PAUL, PETER, AND LACKEY'S EMPLOYMENT WITH & CONTRACTUAL OBLIGATIONS OWED TO PLAINTIFFS**

91. Paul was a co-founder and president of NEPSI from February 1995 until October 2020. Following the acquisition of NEPSI by AMSC until April 2023, he directed the engineering efforts of NEPSI's medium-voltage, metal-enclosed capacitor bank and harmonic filter product lines, oversaw the design, manufacturing, and commissioning of systems in over 1,000 project locations worldwide, collaborated with NEPSI vendors to fast-track the development of certain circuit breakers for capacitive load switching, was responsible for NEPSI's intellectual property and technical education, as well as its technical publications, and developed specialized spreadsheet design tools to facilitate the proper rating of reactors, resistors, and capacitors in various environments.

92. In addition, following AMSC's acquisition of NEPSI, Paul's responsibilities included: (a) NEPSI's integration into AMSC, including directing the integration of NEPSI's metal-enclosed capacitor bank and harmonic filter product lines into AMSC's global smart grid portfolio; (b) acting as a technical subject matter expert, ensuring technical continuity and preserving customer confidence in NEPSI's products and integration into the customer's system post-acquisition; and (c) supporting sales and engineering teams in deploying NEPSI's products.

93. Peter was also a co-founder and Vice President of Engineering for NEPSI, starting in February 1995, upon the founding of the company, and departing from NEPSI in September 2024. Post-SPA, Peter's title was changed to Managing Director, NEPSI Engineering.

94. Through his employment and based on his role with NEPSI, his responsibilities spanned the full engineering scope of NEPSI's medium-voltage power quality solutions, including the electrical design, switching, protection and control systems, as well as mechanical, structural, and thermal design.

95. As a co-founder, Peter, among other things:

a. led the electrical and mechanical design of NEPSI's metal-enclosed capacitor banks, harmonic filters, and motor starting systems for utility and industrial applications;

b. scaled the company's engineering capabilities, product development processes, and technical execution as NEPSI grew into an established leader in medium-voltage reactive compensation and power quality solutions;

c. applied advanced engineering principles to solve complex power quality challenges, including motor starting transients, harmonic distortion in industrial facilities, and utility-scale reactive power requirements;

d. developed standardized design practices, switching and protection schemes, and integrated system designs that supported long-term field reliability across a broad global installed base; and

e. supported manufacturing, application engineering, and technical sales efforts to help align product performance, customer requirements, and successful project delivery.

96. For nearly 16 years, Lackey was responsible for creating detailed two-dimensional and three-dimensional models, drawings, and technical documentation to support the design and manufacturing of NEPSI's power quality and power systems equipment. In his role, he reported directly to Peter until Peter left NEPSI, and he collaborated closely with NEPSI's electrical engineers, mechanical engineers, and quality assurance teams to ensure that NEPSI's designs were accurate, manufacturable, and compliant with applicable industry standards.

97. Accordingly, to ensure that its investment in acquiring NEPSI was secure, as part of the terms of the SPA, and as a condition of that agreement and continued employment with NEPSI, Paul, Peter, and Lackey signed various agreements with Plaintiffs.

98. In addition to the terms discussed pertaining to the SPA in the above paragraphs, Paul and Peter each signed an Employment Agreement, with an effective date of October 1, 2020. These agreements made clear that, for Paul and Peter's continued employment with NEPSI and as a condition to enter into the SPA, they each needed to sign the Employment Agreements.

99. Additionally, Lackey, as a condition of his continued employment with NEPSI and also for valuable consideration was required to and did sign the Employee Nondisclosure and Developments Agreement.

100. Paul and Peter's Employment Agreements were functionally identical and required each to acknowledge that NEPSI's business, technical, and financial information "is and shall be the exclusive property of [NEPSI]." (Employment Agreements at ¶ 2(a) (attached hereto as Exhibits 2 & 3).)

101. Both also agreed that NEPSI's "Proprietary Information" included, but was not limited to: "inventions, trade secrets, products, processes, designs, know-how, systems, methods, techniques, formulas, compositions, compounds, projects, developments, proposals, plans, research data, clinical data, financial data, personnel data, computer programs, and customer and supplier lists." (*Id.*)

102. Paul and Peter further agreed that they would "not disclose any Proprietary Information to others outside the Company or use the same for any unauthorized purposes" "either during or after their employment, unless and until such Proprietary Information has become public knowledge without fault by him." (*Id.*)

103. Paul and Peter also agreed through the Employment Agreements that any "Developments", which included "any invention, discovery, design, development, improvement, process, software program, or work of authorship, whether patentable or not" belonged to Plaintiffs. (*Id.* ¶ 3(a).)

104. Paul and Peter also agreed in the Employment Agreements to eighteen month non-compete and customer and employee non-solicitation restrictions. (*Id.* ¶¶ 5 & 6.)

105. Through the Employment Agreements, Paul and Peter also agreed that, if there was a breach or threatened breach of the restrictive covenants, including the confidentiality and invention assignment provisions, that Plaintiffs would suffer "irreparable harm", "for which monetary damages would not be an adequate remedy, and further agree[d] that in the event of a breach or threatened breach" Plaintiffs "shall … be entitled to equitable relief, including a temporary restraining order … without any requirement to post bond". (*Id.* ¶ 7.)

106. Similarly, through his agreement, Lackey agreed to substantially identical confidentiality and invention assignment provisions as Paul and Peter. (Employee Nondisclosure and Development Agreement at ¶¶ 1 & 2 (attached as Exhibit 4).)

107. Also like Paul and Peter, Lackey agreed that a violation of his agreement would cause NEPSI irreparable harm and that NEPSI would not need to post a bond to obtain injunctive relief. (*Id.* ¶6(f).) Lackey's agreement also contains a New York choice-of-law provision. (*Id.* ¶6(h).)

108. As a function of their positions with NEPSI before and post-SPA, NEPSI gave Paul, Peter, and Lackey access to Plaintiffs' confidential, proprietary, and trade secret information, and entrusted them with their highly valuable customer relationships.

109. Due to Paul and Peter's positions with NEPSI, they had access to, knowledge about, and helped develop essentially all of NEPSI's most valuable information. Lackey similarly had extensive access to NEPSI's most valuable information based on his role as NEPSI's CAD Manager.

110. This information would not have been provided to any of Paul, Peter, or Lackey without their agreements to protect and not disclose or use Plaintiffs' confidential information and developments.

**<u>DEFENDANTS' BAD ACTS</u>**

111. On September 8, 2026, VarStec announced its launch.

112. In is LinkedIn announcement, in an article written by Paul, VarStec made clear that it intends to directly compete against NEPSI, explaining:

> **From Experience to Innovation: Introducing VarStec Power Solutions**
>
> 
>
> **Paul B. Steciuk**
> Co-Founder, President & Senior Power Systems Engineer at VarStec Power Solutions | Subject Matter Expert: MV Reactiv...
>
> September 8, 2026
>
> I've spent more than 30 years working in medium-voltage power systems, and I am pleased to continue that work with VarStec Power Solutions.
>
> We founded VarStec to combine decades of practical engineering and application experience with a fresh approach to designing and manufacturing medium-voltage reactive compensation and power-quality equipment.
>
> VarStec designs and manufactures metal-enclosed capacitor banks, harmonic filter banks, MotorVAR motor-starting capacitor systems, hybrid STATCOM + capacitor bank systems, and custom specialty medium-voltage equipment. Our system-fit solutions are engineered for demanding industrial applications, including mining, petrochemical and petroleum facilities, renewable energy projects, data centers and AI infrastructure, and other large power-consuming operations requiring power factor correction, harmonic mitigation, voltage support, motor-starting assistance, and dynamic reactive compensation.

(VarStec Sept. 8, 2026 LinkedIn Announcement (attached as Exhibit 5).)

113. A few days before this announcement, longtime NEPSI employee, Lackey, resigned.

114. In the aftermath of his resignation and in light of the announcement that Paul and Peter had formed VarStec and were bringing it to market, Plaintiffs became suspicious of where Lackey might be taking employment.

115. On information and belief, Lackey took a position with VarStec.

116. On September 10, 2026, Lackey returned his NEPSI-issued computer to Plaintiffs. Plaintiffs immediately began to undertake forensic imaging and analysis of Lackey's computer, as well as to investigate Lackey's activity on NEPSI's computer network.

117. What Plaintiffs found was astonishing and showed the lengths to which Defendants were going to improperly compete.

118. Specifically, between August 12, 2026 and August 14, 2026, Lackey accessed and selectively downloaded over 7000 files from NEPSI's server to a USB device bearing Seagate serial number 00000000NABA6L95 with Combined ID: 3010_44069_00000000NABA6L95 and Product name: BUP Portable. Amongst these files were thousands of proprietary drawings, which include trade secret designs and specifications.

119. A sampling of the files show file names that were downloaded, included file names such as:

a. 15kV Incoming Compartment Design 06-2026.dwl

b. 15kV Incoming Compartment Design 06-2026.dwl2

c. 34.5kV All Incoming Compartments 08-2026.dwl2

d. 34.5kV All Incoming Compartments 08-2026.dwl

e. Seismic Enclosure Go-Bye.dwl

f. Seismic Base to Pad Example.dwl

g. 3-Line Diagram Go-Bye (Expandable) 06-2026.dwl

h. NEPSI 1-STAGE VVO 07-20-2023.dwg

i. HANDLE – TEMP.dwg

j. Lifting plate.dwg

k. base channel steel.dwg

l. 38KV, 2-STAGE, SS SWITCH FILTER READY CAP BANK 06-28-2021.dwl

m. Key Interlock System Design Go-Bye.dwl

n. Typical Hybrid Capacitor Bank 08-2026.dwl

o. Typical Hybrid Capacitor Bank 06-28-2021.dwl

p. Enclosure Steel Design.pdf

q. Enclosure Design.dwl

r. Enclosure Basic Design 08-2025.dwl

s. Typical Drawing - 13.8kV 1 thru 5 Stage PS-25 Cap bank 06-2026.dwl

t. 27kV Incoming Compartment Design 06-2026.dwl

u. Resistor Warning Signs.dwg

v. 3D Resistor.dwl

w. 3D Capacitor.dwg

120. These documents constitute proprietary and trade secret NEPSI design drawings. A competitor in possession of these drawings would be able to replicate NEPSI's designs and unfairly compete against NEPSI.

121. In addition, some of the downloaded files include technical specifications for NEPSI's customers. The customer-specific files downloaded by Lackey include those of

customers that are some of NEPSI's most lucrative customers in the years following AMSC's acquisition of NEPSI.

122. These are the sorts of documents and drawings that NEPSI routinely marks as "Confidential" and which an employee, like Lackey, and former executives, like Paul and Peter, knew constituted NEPSI's confidential, proprietary, and trade secret information.

123. The files listed above are mere examples of the file names of the 7000 plus documents that Lackey downloaded.

124. Several of the "documents" Lackey downloaded are more than singular files, but instead, comprise a multitude of embedded design files. Just by way of example, the document entitled "15kV Incoming Compartment Design 06-2026.dwl" comprises almost 250 completed designs for different use applications along with details regarding the particular components in each completed design. The menu of completed designs enabled NEPSI to select from previous completed and approved designs created and refined through real-world projects or based on experiences gained through such real-world projects and present proposed designs to customers in a matter of days, as opposed to six or more weeks as is common with NEPSI's competitors. This rapid response gives NEPSI an enormous competitive advantage. Having access to copies of such documents would similarly enable Defendants to create proposed drawings much faster than others in the industry – a capability Defendants would not have but for its misappropriation of Plaintiffs' trade secrets. Indeed, by having access to NEPSI's documents, Defendants are immediately able to replicate NEPSI's design processes and product designs and immediately and directly compete with NEPSI – none of which would be possible without misappropriation of NEPSI's trade secrets and proprietary information.

125. Moreover, Plaintiffs' investigation shows that, in many cases, Lackey changed the file name to suggest that the files belonged to VarStec, including a number of documents labeled "VarStec Enclosure Design."

126. Additionally, dozens of the documents include specific and recent design drawings for NEPSI customers, further underscoring the sensitivity of Lackey's actions and Plaintiffs' concern.

127. Given that Plaintiffs repeatedly do business with the same customers year-over-year, misappropriating design drawings for specific customers is particularly concerning.

128. At the time that Lackey downloaded these documents, he was in New York, purportedly for a work-related trip to NEPSI.

129. However, the timestamp of the downloads suggests that he performed the downloads in the evening. A record of Lackey's dinner receipts show that during at least two of the dinners, Lackey was accompanied by an unknown second person. True and correct copies of Lackey's submitted receipts are attached as Exhibit 6.

130. While Lackey was employed with NEPSI, his job responsibilities necessitated him having access to NEPSI's trade secrets and proprietary information, however, no legitimate business reason existed for Lackey to download these files to a USB enabled device.

131. No legitimate business reason existed for Lackey to change NEPSI file names to be named "VarStec" documents.

132. At this point, Plaintiffs were not even aware that VarStec existed.

133. Given that VarStec had not even publicly launched, no question should exist that Lackey renaming files as "VarStec" during his NEPSI employment was done at the behest of VarStec, Paul, and/or Peter.

134. On information and belief, Lackey was at the dinner with or in communication with Paul and/or Peter at or around the time that he downloaded these documents.

135. On further information and belief, Lackey downloaded NEPSI's confidential, proprietary, and trade secret information at the behest of Paul, Peter, and VarStec.

136. Even before this discovery, Plaintiffs were significantly concerned about Paul, Peter, and VarStec's intent to compete in the medium-voltage, metal-enclosed capacitor bank and harmonic filtering systems industry.

137. Indeed, a comparison of the two websites shows the extent of VarStec's planned competition, with a product-by-product comparison showing the following:

| VarStec Products | NEPSI Products | Notes |
|---|---|---|
| Medium-Voltage Harmonic Filter Banks | Harmonic Filter Banks | Both are listed as metal enclosed and with voltage range 2.4 kV through 38 kV |
| Medium-Voltage Metal-Enclosed Capacitor Banks | Power Capacitor Banks | Both are listed as metal enclosed and with voltage range 2.4 kV through 38 kV |
| Hybrid STATCOM + Capacitor/Filter Banks | DVAR® STATCOM | VarStec does not make a STATCOM so they must purchase it and package it with their Cap/filter banks; AMSC has a STATCOM called DVAR that they combine it with cap banks. |
| MotorVAR | actiVAR | NEPSI's **actiVARs** are custom designed for power systems requiring near instantaneous var support to mitigate voltage sags, voltage flicker, and high inrush currents associated with starting large synchronous and induction motors; Varstec's MotorVAR™ systems are engineered for applications where large medium-voltage induction or synchronous motors, typically in the 4,000 to 15,000+ HP range, must be started reliably without unacceptable voltage sag. |
| Medium Voltage Transient Voltage Surge Suppressors (MV-TVSS) | MV-TVSS | Both are medium voltage |
| RC Snubbers for Transformer Protection | RC Snubbers | Both are medium voltage |
| Motor Surge Protection (MSP) | MSP | Both are medium voltage |

138. VarStec intends to "design" and manufacture identical products to what NEPSI already does. Coupled with the design drawings Defendants misappropriated and the innate knowledge that Paul and Peter possess, based on their co-founding of NEPSI, VarStec has a

substantial head start to get to market that it would not have without NEPSI's know-how and its confidential, proprietary, and trade secret information.

139. As one example only, based on the documents it misappropriated and Paul, Peter, and Lackey's retained knowledge, VarStec knows proprietary and trade secret NEPSI information relating to the mount ("hold-down plate") for securing the enclosure to a concrete pad.

140. The thickness of the steel and the angles were refined through trial and error. The finished product was developed through experience.

141. Another example is the door safety latch assembly, which is especially interesting because of the way it latches and the custom component required as part of this assembly. If the door is not fully closed, the security key cannot be removed, thus indicating an unsafe condition. This safety feature was developed over time and would provide a competitor with an immediate advantage in usurping the trial-and-error that NEPSI utilized over time to create this additional safety feature.

142. Another example is Lackey downloading NEPSI's safety sticker drawing. Through significant human factors analysis, as well as NEPSI's ISO 9001 certification, NEPSI has developed a series of custom warnings and safety designs intended to protect end users. This information would not be visible to someone in the public and would require access to an end product, often not available even to competitors unless they were in the specific facility. Indeed, NEPSI's completed enclosures are not accessible to the public, and instead, access is restricted by fencing and security around the substations, as well as locked doors. To take advantage of NEPSI's safety sticker and warnings design drawings would again erode NEPSI's competitive advantage, development of safety precautions, and provide an unearned advantage to a new market entrant like VarStec.

143. Thes same examples can be provided across the entire development of NEPSI's product line. NEPSI's design processes, design specifications, component part designs, and component part specifications are all protected as a NEPSI trade secret.

**Effect of Defendants' Conduct**

144. With Paul and Peter in possession of and using Plaintiffs' trade secrets and confidential and proprietary information and Lackey misappropriating thousands of files, which based on information and belief were at VarStec, Paul, and Peter's behest, Plaintiffs stand to lose substantial business as well as losing the value of its goodwill, reputation, trade secrets, confidential and proprietary information, customer relationships, and employee relationships, which cannot be adequately addressed at law.

145. During their NEPSI employment, Paul, Peter, and Lackey were exposed to and helped develop NEPSI's confidential and trade secret information relating to design processes, design specifications, component part designs, component part specifications, vendor relationships, customer relationships, sales strategies, and confidential information relating to customer's preferences, NEPSI's products and services, as well as other information identified above.

146. Since their departure from NEPSI, on information and belief, Paul and Peter have not had any significant employment or work within the industry.

147. Paul and Peter, through their ownership of, and Lackey, through his employment with, VarStec are now in positions where there is no scenario that NEPSI's confidential and trade secret information and customer relationships do not get used, which is and will continue to erode Plaintiffs' standing in the custom medium-voltage, metal-enclosed power capacitor banks and harmonic filter banks industry, which has already cost Plaintiffs and will continue to cost Plaintiffs the loss of a substantial amount of business. Plaintiffs' confidential information, trade secrets, and

customer relationships however are invaluable, the loss of which would provide an immediate benefit to Defendants, and an equally immediate irreparable detriment to Plaintiffs' business.

148. By definition of their positions with VarStec and their possession of NEPSI's trade secrets, Paul, Peter, and Lackey have used, threaten to use, and will inevitably disclose NEPSI's confidential, proprietary, and trade secret information. Paul, Peter, and Lackey cannot perform their jobs for VarStec without violating their agreements and without using Plaintiffs' trade secrets and confidential and proprietary information.

149. Further, Paul and Peter's decision to form VarStec and compete directly with NEPSI in the custom medium-voltage, metal-enclosed power capacitor banks and harmonic filter banks industry poses harm far beyond just significant monetary losses.

150. Based on the information currently in Plaintiffs' possession, Paul and Peter, using the information that Lackey stole at the behest of Paul, Peter, and VarStec, are and will continue to attempt to sell competing services to NEPSI's customers using Plaintiffs' confidential and trade secret information.

151. Defendants have and will continue to have an unfair advantage in targeting NEPSI's customers, using NEPSI's design processes, design specifications, component part designs, component part specifications, vendor relationships, customer relationships, sales strategies, and confidential information relating to customer's preferences, NEPSI's products and services, based on Plaintiffs' successes and rejected plans as well as the bids and contracts that NEPSI provided to its customers. Paul, Peter, and Lackey have valuable know-how, all of which was owned by NEPSI and purchased by AMSC, on how to design and improve VarStec's own services, customer relationships, products, and goodwill, all of which will be used to the detriment of Plaintiffs' trade secrets and confidential information.

152. All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Plaintiffs, including the loss of value of confidential, proprietary, and/or trade secret information, the loss of long-standing customer relationships, loss of goodwill, as well as damage to Plaintiffs' reputation as an industry leader and its ability to successfully market its goods and services. Money alone cannot make Plaintiffs whole.

**COUNT I**
**VIOLATION OF DEFEND TRADE SECRETS ACT, 18 U.S.C. §1832, *ET SEQ.***
**(ALL DEFENDANTS)**

153. Plaintiffs hereby repeat, reallege, and incorporate by reference the allegations which are contained in Paragraph 1 through 152.

154. The Defend Trade Secrets Act ("DTSA") defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. *See* 18 U.S.C. §§ 1836, 1839.

155. Defendants acquired Plaintiffs' trade secrets by improper means and without authorization. In particular, Defendants obtained trade secrets from Plaintiffs through, *inter alia*, surreptitious and improper file downloads and through use and retention of trade secret information based on their decades-long employment with NEPSI, and have used and are threatening to use these misappropriated trade secrets to form VarStec and compete against NEPSI in the custom medium-voltage, metal-enclosed power capacitor banks and harmonic filter banks industry.

156. The information that Paul, Peter, and Lackey have provided to VarStec and that Defendants have used regarding Plaintiffs' design processes, design specifications, component part designs, component part specifications, vendor relationships, customer relationships, sales

strategies, and confidential information relating to customer's preferences, NEPSI's products and services, as well as other information, constitute trade secrets within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

157. As detailed above, Plaintiffs take reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

158. Defendants knew or should have known that Plaintiffs' trade secrets: (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by Plaintiffs at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Plaintiffs' competitors; (e) would provide significant benefit to a competitor seeking to compete with Plaintiffs; and (f) are critical to Plaintiffs' ability to conduct their businesses successfully.

159. As detailed above, Defendants have wrongfully used Plaintiffs' trade secrets and Paul, Peter, and Lackey failed to return their information, despite contractual obligations to return such information.

160. By disclosing and/or threatening to disclose Plaintiffs' trade secrets to VarStec without Plaintiffs' consent, Defendants have misappropriated and continue to threaten to misappropriate Plaintiffs' trade secrets in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

161. The information that Defendants have misappropriated or threaten to misappropriate describes and relates to Plaintiffs' highly confidential business relationships,

custom designs and specifications, strategic plans, which involve products that are sold in, utilized throughout, and/or travel through interstate commerce.

162. Should Defendants continue to disclose or threaten to disclose Plaintiffs' trade secrets, the disclosure of such information will harm and/or threaten to harm Plaintiffs and their legitimate business interests.

163. Defendants' actions are and were willful and malicious.

164. If information pertaining to Plaintiffs' trade secrets are disclosed by Defendants, it could destroy Plaintiffs' competitive advantage.

165. Because Defendants' misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, Plaintiffs request that this Court grant injunctive relief against Defendants from actual or threatened disclosure or utilization of Plaintiffs' trade secrets, in addition to granting Plaintiffs' actual, incidental, compensatory, punitive, exemplary, consequential damages, and attorney's fees and costs.

## COUNT II
## BREACH OF CONTRACT
## (PAUL, PETER, & LACKEY)

166. Plaintiffs hereby repeat, reallege, and incorporate by reference the allegations which are contained in Paragraph 1 through 152.

167. The SPA that Paul and Peter executed constitutes a valid and enforceable agreement.

168. The Employment Agreements that Paul and Peter executed constitute valid and enforceable agreements.

169. The Employee Nondisclosure and Development Agreement that Lackey executed constitutes a valid and enforceable agreement.

170. Plaintiffs performed all of the duties and obligations they agreed to and owed Paul, Peter, and Lackey under the SPA, Employment Agreements, and the Lackey Agreement, respectively.

171. Under these agreements, Paul, Peter, and Lackey were prohibited from taking or using Plaintiffs' confidential and proprietary information. (*See* Exhibits 1-4.)

172. In breach of those agreements, Paul, Peter, and Lackey have each used and disclosed Plaintiffs' confidential and proprietary information.

173. Because of Paul, Peter, and Lackey's breaches and prospective breaches, Plaintiffs have been irreparably injured and continue to face irreparable injury. Plaintiffs are threatened with losing the value of their confidential and proprietary information, their customer relationships, their supplier relationships, along with their goodwill, for which a remedy at law is inadequate.

174. Plaintiffs have also been damaged economically in a figure to be proven through trial.

175. Accordingly, Paul, Peter, and Lackey must be enjoined and restrained by Order of this Court. In addition to a remedy at equity, Plaintiffs seek actual, incidental, compensatory, and consequential damages.

## COUNT III
## TORTIOUS INTERFERENCE WITH LACKEY CONTRACT
## (PAUL, PETER, VARSTEC)

176. Plaintiffs hereby repeat, reallege, and incorporate by reference the allegations which are contained in Paragraph 1 through 152.

177. As set forth above, the Employee Nondisclosure and Developments Agreement executed by Lackey (the "Lackey Agreement") is a valid and enforceable agreement. The post-employment confidentiality covenants, development assignment and non-use covenants, and other provisions contained in this agreement are reasonable in scope and are reasonably necessary to

protect Plaintiffs' legitimate business interests in its confidential and proprietary information and developments, and its goodwill.

178. By virtue of their positions with NEPSI and by virtue of their formation of VarStec, Paul, Peter, and VarStec were fully aware of the Lackey Agreement prior to hiring Lackey.

179. Despite having knowledge of the Lackey Agreement, Paul, Peter, and VarStec intentionally induced, permitted, and incentivized Lackey to violate the post-employment and contractual obligations owed to NEPSI, without justification, in an effort to employ him, wrongfully obtain NEPSI's confidential and proprietary information and developments, and unfairly compete with NEPSI.

180. Paul, Peter, and VarStec's intentional interference was malicious, unjustified, and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting Lackey to breach the Lackey Agreement, and constituted an attempt to intentionally weaken NEPSI, in an effort to obtain portions of NEPSI's market share and usurp NEPSI's customer relationships.

181. As a result of Paul, Peter, and VarStec's intentional interference, NEPSI has suffered irreparable and other significant injuries. In addition to a remedy at equity, NEPSI seeks actual incidental, compensatory, punitive, exemplary and consequential damages, and attorney's fees and costs.

## COUNT IV
## TORTIOUS INTERFERENCE WITH EMPLOYMENT AGREEMENTS
## (VARSTEC)

182. Plaintiffs hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraph 1 through 152.

183. As set forth above, the Employment Agreements are valid and enforceable agreements. The post-employment confidentiality covenants, development assignment and non-

use covenants, and other provisions contained in this agreement are reasonable in scope and are reasonably necessary to protect Plaintiffs' legitimate business interests in its confidential and proprietary information and developments, and its goodwill.

184. By virtue of Peter and Paul's positions with NEPSI and by virtue of their formation of VarStec, VarStec was fully aware of the Employment Agreements prior to hiring Paul and Peter.

185. Despite having knowledge of the Employment Agreements, VarStec intentionally induced, permitted, and incentivized Paul and Peter to violate the post-employment and contractual obligations owed to NEPSI, without justification, in an effort to employ them, wrongfully obtain NEPSI's confidential and proprietary information and developments, and unfairly compete with NEPSI.

186. VarStec's intentional interference was malicious, unjustified, and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting Paul and Peter to breach the Employment Agreements, and constituted an attempt to intentionally weaken NEPSI, in an effort to obtain portions of NEPSI's market share and usurp NEPSI's customer relationships.

187. As a result of VarStec's intentional interference, NEPSI has suffered irreparable and other significant injuries. In addition to a remedy at equity, NEPSI seeks actual incidental, compensatory, punitive, exemplary and consequential damages, and attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs American Superconductor Corporation and Northeast Power Systems, Inc. seek judgment in their favor and an Order against Defendants VarStec Power Solutions, Inc., Paul Steciuk, Peter Steciuk, and Glenn Lackey II that grants the following relief:

A. Temporarily, preliminarily, and permanently enjoining Defendants and all parties in active concert or participation with them, from possessing, using, or disclosing, or attempting to possess, use, or disclose Plaintiffs' confidential, proprietary, and/or trade secret information;

B. Ordering Defendants and all parties in active concert or participation with them, to return to Plaintiffs all originals and copies of all files, devices and/or documents that contain or relate to Plaintiffs' confidential, proprietary, and trade secret information, including without limitation, all computers, electronic media, electronic storage devices, and/or electronic and physical documents or files;

C. Awarding Plaintiffs actual, incidental, compensatory, and consequential damages to be proven at trial;

D. Awarding Plaintiffs exemplary or punitive damages in an amount to be proven at trial due to Defendants' willful and malicious activities;

E. Disgorging and/or awarding a reasonable royalty rate on all monies received by Defendants as a result of their tortious actions;

F. Awarding Plaintiffs their reasonable attorney's fees and costs; and

G. Awarding Plaintiffs such further relief as the Court deems necessary and just.

Dated: September 21, 2026

Respectfully submitted,

**SAUL EWING LLP**
1270 Avenue of the Americas, Suite 2800
New York, NY 10020
Telephone: (212) 980-7200
Facsimile: (212) 980-7209
E-Mail: john.basinger@saul.com

By: */s/ John A. Basinger*
John A. Basinger

Justin K. Beyer (*pro hac vice forthcoming)*
161 N. Clark St, Suite 4200
Chicago, IL 60601
Phone: (312) 876-7100
Fax: (312) 876-0288
Email: justin.beyer@saul.com

Joseph M. Kuo (*pro hac vice forthcoming)*
161 N. Clark St, Suite 4200
Chicago, IL 60601
Phone: (312) 876-7100
Fax: (312) 876-0288
Email: joseph.kuo@saul.com

John Powell (*pro hac vice forthcoming*)
131 Dartmouth Street, Suite 501
Boston, MA 02116
Phone: (617) 723-3300
Fax: (617) 723-4151
Email: john.powell@saul.com

VERIFICATION

I, Frank Steciuk,

1. I am Vice President, Group General Manager, Power Electronics for Northeast Power Systems, Inc. In my position, I worked directly with American Superconductor Corporation to investigate the facts and circumstances surrounding this Verified Complaint. I am authorized to make this Verification on Plaintiffs' behalf.

2. I have read the foregoing Verified Complaint and, based on my personal knowledge and my knowledge of information reported to me by colleagues and based on American Superconductor Corporation and Northeast Power Systems, Inc.'s investigation, the factual allegations contained the Verified Complaint are true. As to any factual allegations made on information and belief, based on Plaintiffs' investigation, of which I was personally involved, I believe them to be true and correct.

3. I certify under penalty of perjury under the laws of the United States of America that the foregoing statements made by me are true and correct.

Executed in 9/21/2026, New York, on September 21, 2026

Signed by:
Frank Steciuk
5C58F5C23F7C458...
Frank Steciuk, Vice President, Group General Manager, Power Electronics